UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

FELIX RAMIREZ,

        Plaintiff,

   v.                                                Case No. 11-C-754

JOHN PIA, individually,
JOHN PIA d/b/a South Mill Mushroom Sales,
SOUTH MILL MUSHROOM SALES, INC.,
KAOLIN MUSHROOM FARMS, INC. and
DALLAS SOUTH MILL DISTRIBUTION, LP,

        Defendants.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND ORDER FOR JUDGMENT**

      Plaintiff Felix Ramirez sued Defendants John Pia, John Pia d/b/a South Mill Mushroom Sales, Inc., South Mill Mushroom Sales, Inc., Kaolin Mushroom Farms, Inc., and Dallas South Mill Distribution, LP, for breach of an employment contract and seeks damages for unpaid commissions and other losses flowing from his termination. Ramirez also asserted a claim against the defendants for unpaid salary or commissions pursuant to Section 109.03 of the Wisconsin Statutes. Ramirez alleges that he entered into an employment contract for a term of two years with the defendants and that his employment was terminated without just cause after only ten months. The case was tried to the Court over a two-day period from September 25 to September 26, 2012. The parties agree that Wisconsin law governs, and they have submitted post-trial briefs setting forth their respective positions on the law and evidence. Having considered the evidence and arguments presented, the

Court now finds that Ramirez has failed to establish that the defendants breached the contract with him in terminating his employment. The Court also finds no violation of Section 109.03. The action will therefore be dismissed. What follows are the court's findings of fact and conclusions of law.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**1. Jurisdiction**

The matter is before the court under diversity jurisdiction pursuant to 28 U.S.C. § 1332. Ramirez is a resident of Outagamie County, Wisconsin. John Pia is a resident of Pennsylvania. South Mill Mushroom Sales, Inc. (SMMS) and Kaolin Mushroom Farms, Inc. (Kaolin) are corporations incorporated under the laws of Pennsylvania and their principal place of business is in Kennett Square, Pennsylvania. Dallas South Mill Distribution, L.P. (DSMD) is a Texas limited partnership with its principal place of business in Dallas, Texas. DSMD has two limited partners, John Pia and Michael Pia, both of whom are residents of Pennsylvania. In addition, Mushroom Substrate Technologies, Inc., incorporated under the laws of and with its principal place of business in Pennsylvania, is DSMD's general partner. Because there is complete diversity of citizenship and the amount in controversy is in excess of the jurisdictional amount of $75,000, this Court has subject-matter jurisdiction under § 1332.

**2. Overview of the Facts**

SMMS, Kaolin, and DSMD are primarily mushroom produce suppliers. John Pia is an owner and the president of SMMS. Pia had met Ramirez long before the facts giving rise to this case occurred when Ramirez was working as a buyer for a food distributer with whom Pia did business. The two had remained in contact over the years after Ramirez left that position. Ramirez had begun

2

working in real estate, and he contacted Pia on several occasions to see if he was interested in buying real estate in the Chicago area. Sometime in the summer of 2009, Ramirez approached Pia about the possibility of Pia investing in a plan to develop and market a protein additive to coffee. After Pia indicated he was not interested, he either offered a job, or Ramirez asked if he had any openings.

At the time, Pia was interested in expanding his business to include non-mushroom produce sales. Pia's companies specialized in mushrooms, but Pia felt the same infrastructure could easily support sales of other produce. The company already had employees at each of its plants tasked with procuring non-mushroom produce and, according to Pia, was already selling almost 12,000 cases per week. Pia wanted to expand that side of the business. Based on Ramirez' representations of his contacts and experience with shippers, growers and customers in the food industry, along with his Hispanic background and his ability to speak Spanish, Pia believed that Ramirez would be able to significantly expand the company's non-mushroom produce procurement, particularly in Mexico and Latin America. With this in mind, Pia began discussions with Ramirez about the compensation Pia, or his company, would pay Ramirez "to perform the duties of developing, implementing and maintaining the non-mushroom supply side for the SMMD business." (Ex. 1001.) Although the initial discussions envisioned Ramirez working as an independent contractor, Pia wanted a greater commitment from Ramirez and so offered him a position with the company as an employee.

On August 6, 2009, the parties reached final agreement on the terms of compensation. (Ex. 1.) In addition to outlining Ramirez's monthly rate of compensation, vacation, a commission schedule and the conditions Ramirez would need to meet in order to be eligible for commissions, Pia's email contained a provision that stated: "Commitment Period: Two Years." It also provided that Ramirez would start his new employment no later than August 10, 2009.

3

As an initial matter, the parties differ as to who Ramirez' actual employer was. Although Ramirez was considered an employee, he did not receive an employee handbook from any of the Defendants. The employment agreement indicates that Ramirez' salary and business related expenses were to be paid by "SMD," which under the circumstances is ambiguous. From their testimony, it appeared that both Ramirez and Pia understood that SMD stood for South Mill Distributors. However, John Pia executed the agreement in his capacity as president of SMMS. In addition, Defendants admitted in an interrogatory response that Ramirez' official employer from August 11, 2009, to December 31, 2009, was DSMD and his official employer from January 1, 2010 to June 10, 2010 was Kaolin. Ramirez maintains that Pia was acting as an agent for an undisclosed principal, namely Kaolin and DSMD and therefore, Pia, Kaolin, and DSMD should be held liable under the contract in addition to SMMS. Because the court ultimately concludes that Ramirez' termination was for cause and his claims should be dismissed on the merits, it is not necessary for the court to unravel the different theories as to the liability of Pia and his various companies. To avoid confusion, however, SMMS will be referred to as Ramirez' employer hereinafter.

The parties also offered starkly different views as to how Ramirez' right to commissions was to be determined under their agreement and of how successful Ramirez was in procuring non-mushroom produce for SMMD. Ramirez contends that he was to be credited with all new sales of non-mushroom produce over the six thousand per week threshold that the company had already achieved before he started, even if he had no role in procuring the produce that was sold. Pia, on the other hand, claims he had no intention of crediting Ramirez with sales of produce he had no role in procuring. The six thousand case threshold represented the minimum amount he was to sell before he could be paid a commission. Furthermore, he would only be eligible for a commission if his sales

4

over the year averaged a minimum of six thousand cases per week and, in addition, his sales over the last four weeks of the first year averaged at least 12,000 cases per week.

Their disparate views of how Ramirez' commission was to be calculated is reflected in their disparate assessments of his actual performance. Viewing total non-mushroom produce sales of the various companies, Ramirez testified that his efforts were successful in maintaining current suppliers and recruiting new ones. Ramirez testified that his initial efforts were to get paperwork and a process in place. He also made a trip to Mexico and visited the different plants. He was also given additional responsibilities over operations at facilities in Ohio and Kentucky with no change in compensation. Ramirez testified that he was not given a minimum number of suppliers he had to recruit and denied that anyone had ever warned him that he was not procuring enough produce or that if he did not get more he would be fired. Despite his efforts, Ramirez testified he was terminated on June 10, 2010. No reason was given; he was told only that it wouldn't work. Based on his calculations, Ramirez testified he was entitled to payment of more than $90,000 in commissions that he earned or was reasonably likely to have earned. With lost salary for the additional fourteen months of his contract, along with compensation for unused vacation, Ramirez calculated his damages as over $250,000. (Ex. 3.)

Pia, on the other hand, testified that Ramirez failed to perform as he had promised. Over the entire ten months he worked for the SMMS, Pia testified, Ramirez brought only one new supplier to the company. Averaging out the total sales from that one supplier over the entire ten month period he was with the company comes to less than a thousand cases per week. After approximately six months, Pia concluded that Ramirez' procurement effort failed. At that point, according to Pia, Ramirez asked if he could manage one of the company's facilities. Ramirez claimed that his real

5

estate experience would serve him well in performing such duties, and he was then given responsibility for the Ohio and Kentucky facilities. As it turned out, however, problems of shrinking inventory and substantial losses at the facilities, combined with a lack of communication with Ramirez, according to Pia, left the company with no choice but to terminate his employment.

Pia's testimony was confirmed by two company employees. Brian Zary, controller for the companies, testified that at weekly sales meetings, Ramirez would go over what products he would be procuring. The deals he spoke of never materialized, however, and plant managers became more and more frustrated with Ramirez. Mark Moran, the operations manager to whom Ramirez directly reported, likewise corroborated Pia's testimony. Moran testified that he traveled with Ramirez to Mexico and introduced him to his contacts. Moran thought Ramirez would develop leads but nothing happened. Moran requested weekly activity reports from Ramirez, who worked remotely from the company. He rarely received the reports without a battle, and when he did, they showed minimal activity, usually with the same people. Moran testified that he spoke to Ramirez about the lack of activity and regularly expressed his frustration to him over his lack of effort and activity during weekly conference calls.

In January or February, after concluding that Ramirez had failed in his role as a procurement specialist, Pia moved him, with his approval, to the position of facilities manager at the company's Ohio and Kentucky facilities. As facilities manager, Ramirez was responsible for the overall profitability of the plants. He was to oversee operation, manage labor and supervise buying. Under Ramirez' management, Moran testified that the facilities experienced shrinking and missing inventory and consistent decline. Zary testified that the losses at the Ohio facility under Ramirez' management from February through June of 2010 was more than $238,000. At the facility in Kentucky, the loss

6

was more than $22,000 over the same period. At one point, Moran made an unannounced visit to the Kentucky facility to see why there was so much inventory shrinkage. He saw thousands of dollars worth of produce rotting on the shelves. By June 10, 2010, Pia had had enough and instructed Moran to terminate Ramirez' employment.

**3. At-Will Employment or Two-Year Term**

A key dispute between the parties centers on whether Ramirez' employment was at the will of his employer or for a two-year term. Ramirez contends that the provision listing a two-year "commitment period" means that the contract had a two-year term. By terminating his employment after only ten months without cause, Ramirez claims the defendants breached their contract with him. SMMS, however, reads the agreement differently. It contends that the phrase commitment period by itself is ambiguous and therefore extrinsic evidence is needed to determine its meaning. Pia offered such evidence at trial. He testified that he had wanted a two-year commitment period because he was concerned that Ramirez would continue his real estate business and not give a full commitment to developing the non-mushroom produce part of the business. By requiring a two-year commitment from him, Pia intended to insure this would not occur. Pia also testified, however, that it was not his intent to guarantee Ramirez' employment for two years.

Regardless of Pia's intent, however, the language does not limit the two-year commitment to Ramirez. Ramirez also testified that it was important to him to have a commitment from the company that he would not be terminated at its pleasure since he thought it would take time to build the sales and he was the sole breadwinner for his family. He was also giving up his real estate practice. Under these circumstances, the court concludes that the commitment period applies to both parties and as a result, the contract was for a two-year term.

7

The language is not ambiguous. There is nothing to suggest it was intended to apply to only one of the parties, which would be considered an unusual reading of the provision. After all, Ramirez had as much reason to seek a commitment from Pia as Pia had for seeking one from him. Absent express language limiting the commitment to one party, it would be unreasonable to so construe it. Finally, even if the language was ambiguous, the extrinsic evidence only explains why Pia wanted Ramirez to provide a two-year commitment. Pia did not testify that he conveyed to Ramirez that the commitment was only one way, nor did he suggest any reason to believe Ramirez so understood it. Moreover, Ramirez testified that he believed it was a two-way commitment.

The case cited by Defendants, *Dillon v. City of New York*, 261 A.D.2d 34 (N.Y. App. Div. 1999), provides for a useful distinction to the facts of this case. In *Dillon*, the plaintiffs, two assistant district attorneys, signed a document as a condition of employment that contained the following language: "Assistant District Attorneys are required to abide by a commitment to give four years of initial service to the Office of the District Attorney." *Id.* at 36. The employment manual, on the other hand, made clear that they could be terminated at any time absent an express agreement. *Id.* at 39. The plaintiffs were terminated and their personnel files marked accordingly after they attempted to resign before the expiration of their commitment period. Concerned that the termination would adversely affect future job prospects, the plaintiffs sued for defamation. The court dismissed the claim on the ground that the allegedly defamatory statement was true. They were terminated for failing to fulfill their commitment. In so ruling, the court noted that "[w]hile plaintiffs were obligated to remain for the commitment period, the policy manual did not create any obligation on the employer to retain plaintiffs' services for a term." *Id.* at 39.

8

In contrast to the commitment period in *Dillon*, the relevant contract provision here does not expressly limit the required commitment to Ramirez. Absent language or other evidence indicating an agreement or understanding on the part of both parties that it was to be limited to Ramirez, no such construction can be adopted by the court. For all of these reasons, the court concludes that the contract was for a two-year term.

**4. Just Cause for Termination**

Under Wisconsin law where a contract provides for a fixed term of employment, "the employer has the burden of proving that the employee was discharged for cause, where the employer relies on such a discharge as a ground for terminating the contract prior to its expiration date in the absence of any special provision in the contract providing to the contrary." *Johnson v. Green Bay Packers, Inc.*, 272 Wis. 2d 149, 160-61, 74 N.W.2d 784 (1956). What constitutes good cause for termination, in the absence of a definition of good cause in the contract, is generally a matter of law. *See Thomas v. Beaver Dam Mfg. Co.*, 157 Wis. 427, 429, 147 N.W. 364 (1914). The Wisconsin Supreme Court in *Thomas* explained that "[a]ny inexcusable and substantial insubordination on the part of an employe [sic] or willful refusal to obey such commands amounting to insubordination, is good ground for discharge." *Id.* An employee's failure to perform his duties is also good cause for termination of employment. *Millar v. Joint School Dist. No. 2, Village of Wild Rose*, 2 Wis.2d 303, 312, 86 N.W.2d 455 (1958).

In this case, only some of the terms of the contract, primarily those relating to Ramirez' compensation, were in writing. His duties were not included. From the evidence presented, however, the court finds that Ramirez was hired to develop, implement and maintain the non-mushroom supply of SMMD's business. This is how Ramirez' duties were described in Pia's July 25, 2009 proposal.

9

(Ex. 1001.) In late January or early February, Ramirez and Pia agreed that his duties would change and he took on the responsibility to manage the company's Ohio and Kentucky facilities. Based on the evidence presented, the court finds that Ramirez failed to carry out his duties, both as a procurement specialist and as a facilities manager. In making this determination, the court credits the testimony of Pia, Zary, and Moran. Their testimony was consistent with the exhibits and was more reasonable under all of the circumstances than that of Ramirez.

Pia obviously thought that Ramirez would increase dramatically the non-mushroom produce his company was able to procure and thereby expand that part of the business. Ramirez told him that he had handled more than $50 million in sales in one year while a buyer at a Wisconsin food distributor. He led Pia to believe he had a large number of contacts with shippers, growers and buyers in the food industry that he could draw on to expand the company's non-mushroom side of the business, especially in countries south of the United States border. Pia's reliance on Ramirez' representations is reflected in the generous terms of the contract Ramirez was offered. That Ramirez failed to perform as he had promised is clear from the relatively small increase in sales of non-mushroom produce the company made after he began his employment, as well as Moran's testimony concerning the lack of activity and effort shown in his activity reports. The fact that he added only one supplier who entered into only one transaction with the company over the six month period he worked exclusively as a procurement specialist also supports this finding. Finally, it made no sense to move Ramirez to a management position at the Ohio and Kentucky facilities, a change Ramirez welcomed, if he was performing his job as a procurement specialist.

The court also rejects Ramirez' interpretation of the commission provision of the compensation agreement. Ramirez testified the proper measure of his performance in his

10

procurement role was the amount of non-mushroom produce cases moving through Defendants' entire distribution network whether or not Ramirez was personally responsible for the transactions. This suggestion is fundamentally at odds with the employment agreement. The agreement explained in Section 1(g) that Ramirez could collect a commission "for cases sold above a 'yearly average program to date' volume of 6,000/cases/week". This suggests that Ramirez was expected to procure for Defendants sufficient produce to reach an average of 6,000 cases per week by the end of the year and that he would be entitled to a commission on those sales above the 6,000 case benchmark.

The contract further outlined that the cases Ramirez procured were to be measured on a cumulative basis and commission could only be earned on the cases sold above a baseline of 6,000 cases per week. The contract explained this cumulative measurement this way: "if you sell 7,000 cases one week and 5,000 cases the next week, you will not receive commissions for the 7,000 case week, and in fact you will have a credit in our acct [sic] for 1,000 cases." Furthermore, to qualify for a $.10 commission on sales of cases, Ramirez had to sell an average of 12,000 cases per week, determined by the last four weeks of his first year of employment.

As for Ramirez's suggestion that the cases counted should be for any produce cases moving through Defendants' distribution system, this is directly refuted by Sections 1(g) and (g1d) of the employment agreement. Section 1(g) notes that the measurement for the cumulative cases sold were determined by the cases "you sell," not the total non-mushroom produce sold to Defendants' facilities above a 6,000 case baseline. Section (g)(1)d states that "[s]hould [Ramirez] achieve case count volumes of 18,000 per week as defined in (g)(1)a above in employment year 1, commission will have been earned and will be payable at the end of month 12." Thus, the case count, per the unambiguous

11

language of the contract, is measured by the cases that Ramirez procured for SMMD, not those procured by others within the system. Ramirez's subjective belief and the extrinsic evidence submitted on this issue is irrelevant in the face of the contract's unambiguous language. This reading of the employment agreement is also consistent with the parties' intent. After all, the key service Ramirez promised to provide to the company was the procurement of non-mushroom produce. It makes little sense that Pia would have agreed to compensate Ramirez for the procurement efforts of others.

There was also evidence presented at trial that Ramirez understood the performance of his procurement duties was deficient. Mark Moran, whose testimony the court finds to be credible, testified that he was Ramirez's direct supervisor and gathered weekly activity reports from him. Moran testified that he regularly communicated his concerns to Ramirez regarding his poor performance in his procurement specialist role. Ramirez' testimony that no one told him he was not performing his duties is not credible.

Ramirez' performance as manager of the Ohio and Kentucky facilities provide further cause for his termination. Moran explained that it was Ramirez's responsibility to improve the financial performance of the facilities and to increase the amount of non-mushroom produce he could procure for Defendants. Under Ramirez's management, there were consistent financial losses at the Ohio and Kentucky facilities with no signs of improvement. A May 7, 2010, email from Brian Zary, Controller for Kaolin, to Moran and Pia stated that the Ohio facility had a year-to-date loss of approximately $132,000 and the Kentucky facility had a year-to-date loss of $21,000. (Ex. 1009.) The financial situation at the facilities did not show signs of improvement and Moran testified that he regularly communicated his concerns to Ramirez about his poor management performance.

12

Moreover, Ramirez was unsuccessful in procuring any additional deals in 2010 to provide non-mushroom produce at Defendants' facilities. Ramirez failed to procure non-mushroom sales sufficient to qualify for any commissions, much less meet the 6,000 cases per week threshold. Ramirez was employed to procure non-mushroom produce for Defendants' seven facilities, and he was only successful in procuring 38,000 cases in one deal in late 2009. Even that deal resulted in a loss of over $30,000 due to disputes with the shipper. Although Ramirez identified several vendors from whom he said he procured non-mushroom produce, Zary testified that two were producers the company had already procured from and the others were companies he did not recognize. Since Zary issued payment to all vendors, his lack of recognition strongly suggests they were not producers for the company. The procurement of one transaction that averaged less than 1,000 cases per week for Defendants' facilities during Ramirez's period of employment constituted a breach in his duty to perform under the contract.

The court concludes that Ramirez's lack of performance in his procurement role and in his role as manager of the Ohio and Kentucky facilities provided sufficient cause for SMMS to terminate his employment in June 2010. As a result, SMMS's termination of his employment was not a breach of its contract with him, and Ramirez sustained no damages. He was paid his full salary for the period of time he was employed by SMMD, and he earned no commissions. While he also argues he was entitled to compensation for unused vacation, no such right is set forth in the contract and, in any event, the evidence does not support Ramirez' claim that he did not take at least whatever vacation he may have been entitled to, given the conditions of his employment.

13

**ORDER FOR JUDGMENT**

Based on the Court's findings of fact and conclusions of law, Plaintiff's claims for breach of contract and violation of Section 109.03 of the Wisconsin Statutes are dismissed and Plaintiff is to recover nothing from the Defendants. The Clerk is directed to enter judgment in favor of the Defendants forthwith.

Dated this   11th   day of March, 2013.

                                          s/ William C. Griesbach
                                          William C. Griesbach, Chief Judge
                                          United States District Court